1:26-mj-1035-CDA

FILED ENTERED
LODGED RECEIVED
MAY 01 2026
AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY DEPUTY

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT

I, Daniel O'Rourke, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) being duly sworn, do hereby depose and state that:

## I. PURPOSE OF THIS AFFIDAVIT

1. I submit this affidavit in support of an application for a Criminal Complaint alleging that on February 4, 2026 **KAREEM GESMALLAH ABDALLAH (ABDALLAH)** unlawfully possessed a machinegun in violation 18 U.S.C. § 922(o); and on February 11, 2026 knowingly possessed with the intent to distribute a controlled substance, to wit; fentanyl, in violation of 21 U.S.C. §841(a).

## II. AFFIANT'S BACKGROUND AND EXPERTISE

2. I am a Special Agent with the ATF and have been since February of 2024. I am currently assigned to the ATF Baltimore Field Division, Baltimore Group II, which is a Homeland Security Task Force (HSTF) group, and investigates violations of federal firearm laws, violent crime, and narcotics trafficking. I have attended the United States Department of Homeland Security's Criminal Investigator Training Program ("CITP") and ATF's Special Agent Basic Training ("SABT"), both located in Glynco, Georgia, for a combined period of twenty-seven weeks. I have received training in Federal Firearm Laws and Federal Narcotics Laws administered under Title 18, Title 21 and Title 26 of the United States Code.

3. As an ATF agent based upon my training and experience, I am familiar with the habits, methods, routines, practices and procedures commonly employed by people who illegally possess, sell, and traffic firearms. Through my training experience, as well as conversations with other agents and officers, I am familiar with the techniques employed by people who attempt to import, acquire, and resell firearms in violation of the Gun Control Act, the National Firearms Act,

and in contravention of federal regulations, and the various methods used by these people to evade detection by law enforcement.

4. Prior to becoming a Special Agent, I attended a 7-month law enforcement training academy and served as a police officer with the D.C. Metropolitan Police Department for approximately three and a half years. As an officer, I proactively conducted numerous firearms and narcotics investigations both as a patrol officer and while assigned to the Fifth District's Crime Suppression Team (CST), which included writing and executing search and arrest warrants. These investigations have led to the recovery of over 100 firearms and several felony arrests for weapons and narcotics violations.

5. Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest **ABDALLAH** for the alleged violations, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. I have not, however, excluded any information known to me that would defeat a determination of probable cause. The information contained in this affidavit is based upon my personal knowledge, my review of documents, as well as conversations with other law enforcement officers and other individuals. All conversations and statements described in this affidavit are related in substance and in part unless otherwise indicated.

## III. PROBABLE CAUSE

6. In December of 2025, ATF began investigating King of Smoke, [1] a "smoke shop" located at 5305 East Drive, Suite B, Halethorpe, Maryland 21227. ATF agents received reliable information that the location sold marijuana without a Maryland Cannabis License and that

[1] King of Smoke sells tobacco and tobacco related products, as well as otherwise legal items used in the consumption of tobacco and marijuana products. It is not, however, licensed under Maryland law to dispense marijuana or any other controlled substance.

**ABDALLAH**, an employee of the shop, was selling firearms and narcotics from inside King of Smoke. During the investigation, an ATF undercover agent ("the UC") was introduced to **ABDALLAH** and began contacting him at 667-328-0427 and 410-800-1750 to arrange for the sale of firearms and narcotics.[2]

7. During the investigation, the UC conducted five separate purchases of evidence which were arranged through a series of recorded in-person conversations, phone calls, and text messages. In total, the UC purchased ten firearms to include three machine guns, approximately 2,600 suspected fentanyl pills, approximately one pound of suspected methamphetamine,[3] and approximately three ounces of suspected cocaine from **ABDALLAH** inside King of Smoke. Prior to each transaction, the UC was outfitted with an audio and video recording device and provided with pre-recorded government funds to complete the purchase. After each transaction, investigators followed the UC to a predetermined location where agents took custody of the purchased evidence.

**A. February 4, 2026, Controlled Purchase of a Machine Gun**

8. On February 4, 2026. At approximately 11:00 a.m., **ABDALLAH** called the UC and stated that he (**ABDALLAH**) had good news and was able to procure a Glock model 17 equipped with a "switch," which investigators know from their training and experience to mean a machine gun conversion device (MCD).[4] **ABDALLAH** also stated he was able to procure an

---

[2] **ABDALLAH** initially provided and contacted the UC using the phone number 667-328-0427. On February 16, 2026, Baltimore Police arrested **ABDALLAH** for driving with a suspended license. After his release, **ABDALLAH** contacted the UC on March 14, 2026 and provided 410-800-1750 as his (**ABDALLAH's**) new phone. Since this date, the UC has contacted **ABDALLAH** using the phone number 410-800-1750.

[3] This substance later field-tested negative for the presence of methamphetamine.

[4] A "switch," or "button" sometimes also referred to as a "giggle switch," "Glock switch," or "Glock button" is a type of illegal machinegun conversion device (MCD) which can be attached to a Glock pistol or similar type of pistols to convert them from semiautomatic to fully automatic firearms, i.e. machineguns.

"ARP 7.62" (AR-style pistol chambered in 7.62 caliber) and that he could sell both firearms to the UC.

9. On February 4, 2026, the UC traveled to King of Smoke. At approximately 4:13 p.m., investigators observed **ABDALLAH** arrive in a black Acura sedan bearing Maryland license plate number 1GL2720 ("the Acura") and park in front of King of Smoke. **ABDALLAH** walked to the trunk of the Acura and retrieved a black backpack from the trunk. The UC greeted **ABDALLAH** outside of the Acura. The UC and **ABDALLAH,** who was still holding the black backpack, walked inside King of Smoke. While entering, the UC asked **ABDALLAH** if he owned King of Smoke to which **ABDALLAH** replied, "yeah."

10. Inside King of Smoke, the UC followed **ABDALLAH** past a plexiglass door, which **ABDALLAH** unlocked, to a back room accessible to employees. Upon entering the back room, **ABDALLAH** placed the black backpack on the floor, removed two firearms from it, and placed them on a table. The first firearm was a Glock model 17, Gen 5, pistol chambered in 9mm, bearing serial number BTWF0208 affixed with an MCD. The second firearm was a Palmetto State Armory, PA-15, chambered in .300 blackout, with an obliterated serial number. Both firearms came with small quantities of ammunition loaded in thirty-round magazines.

11. While **ABDALLAH** retrieved the firearms, the UC explained that the UC was a felon.

12. **ABDALLAH** showed the UC the Glock 17 and advised, "Glock 17, gen 5, Glock button,[5]" the UC pointed to the MCD on the back of the Glock 17 and asked **ABDALLAH** if he

5 "Button" or "Glock button" investigators know from their training and experience is a street term for an MCD.

had tested the firearm. **ABDALLAH** advised that he had tested the firearm and acknowledged that the MCD functioned properly to make the Glock fully automatic, i.e. a machinegun.[6]

13. The UC and **ABDALLAH** then discussed the risk of dealing in firearms, **ABDALLAH** pointed to the MCD on the rear of the Glock 17 and stated, "these are f***ing, this is like ten years in f***ing jail."

14. The UC then provided **ABDALLAH** with $3,200 in exchange for the firearms.

15. **ABDALLAH** then began to talk about "blues," which investigators know from their training and experience is fentanyl in the form of blue-colored counterfeit oxycodone pills. **ABDALLAH** advised that he could obtain 1,000 fentanyl pills to sell to the UC for $2,500.

16. The UC asked **ABDALLAH** if he needed the serial numbers to be removed from the firearms he had sold to the UC. **ABDALLAH** advised that he had been told that all the firearms were reported stolen; however, he believed that the UC should still take all the serial numbers off the firearms.

17. At approximately 4:28 p.m., the UC exited the shop and left the location.

18. A query of the federal licensing system (FLS) revealed that **ABDALLAH** is not licensed to sell firearms.[7]

**B. February 11, 2026, Controlled Purchase of Fentanyl**

19. On February 11, 2026, the UC arranged to purchase narcotics from **ABDALLAH** from inside King of Smoke. On February 11, 2026, the UC traveled to King of Smoke. At

---

6 ATF later confirmed through function testing that the Glock 17 equipped with the MCD operated as a fully automatic firearm, a machine gun.

7 FLS is a federal database which records all Federal Firearms License holders, or businesses and individuals in the U.S. who are licensed to legally engage in the business of selling firearms. In order to sell firearms as a business, obtaining a Federal Firearms License is legally mandated.

approximately 1:19 p.m., investigators observed the Acura sedan known to be driven by **ABDALLAH** parked in the gas station at the end of the block near King of Smoke.

20. **ABDALLAH** and an unidentified black male exited the Acura. The UC greeted them and all three individuals walked inside King of Smoke.

21. Once inside, the UC and **ABDALLAH** walked past the front counter to the back room while the unidentified individual stayed just past the front counter.

22. After a brief conversation, **ABDALLAH** produced a clear bag containing 933 full pills and 12 partial pills of suspected fentanyl from his person. The UC then exchanged $3,000 for the pills. During their conversation, **ABDALLAH** asked the UC when the UC might purchase more firearms from him (**ABDALLAH**).

23. The UC exited the shop and traveled out of the area shortly thereafter.

24. The Maryland State Police Forensic Sciences Division tested the pills provided by **ABDULLAH**, and found on March 26, 2026 that they tested positive for fentanyl, a Schedule II controlled dangerous substance.[8]

## IV. CONCLUSION

25. Based on the foregoing information, I believe probable cause exists that on or about February 11, 2026, **KAREEM GESMALLAH ABDALLAH** distributed and possessed with the intent to distribute fentanyl, a Schedule II controlled substance and on February 4, 2026 **KAREEM GESMALLAH ABDALLAH** possessed a machine gun, in violation of 18 U.S.C. § 922(o).

---

8 It should be noted that multiple samples from the narcotics were tested. 1 sample weighing 0.116 grams, was tested and yielded a positive result for the presence of fentanyl while 2 samples, weighing 0.209 grams, yielded a negative result for the presence of narcotics.

26. Accordingly, based on the foregoing facts, I believe probable cause exists to support the issuance of a Criminal Complaint charging **KAREEM GESMALLAH ABDALLAH** with the distribution of narcotics and unlawful possession of a machinegun in the United States, in violation of 18 U.S.C. §841(a) and 18 U.S.C. § 922(o).

Daniel O'Rourke

Special Agent Daniel O'Rourke
Bureau of Alcohol, Tobacco, Firearms and Explosives

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this 30th day of April 2026.

Charles D. Austin
United States Magistrate Judge